UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

SARAH F. MCLAUGHLIN,

                                        Plaintiff,

        v.                                                      06-CV-0376

PETER F. PEZZOLLA, in his individual capacity,
JOSEPH J. COLARUSSO, in his individual capacity,
RITA M. MARTIN, in her individual capacity,
ANTONIA J. FERGUSON, in her individual capacity,
ANN T. NEHRBAUER, in her individual capacity,
VICTOR M. TURNER, in his individual capacity,
KATHLEEN BRODERICK, in her individual capacity,
the STATE OF NEW YORK OFFICE OF MENTAL
RETARDATION AND DEVELOPMENTAL
DISABILITIES, the WILLOWBROOK CONSUMER
ADVISORY BOARD and LAURA MCGRATH,

                                        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

THOMAS J. McAVOY
Senior United States District Judge

## DECISION and ORDER

        Plaintiff, Sarah McLaughlin, brought the instant action seeking injunctive relief and

damages for retaliation pursuant to the First Amendment of the United States Constitution,

42 U.S.C. § 1983, Article 1, § 8 of the New York State Constitution, and New York State

Labor Law § 741, and for attorney's fees pursuant to 42 U.S.C. § 1988 and New York State

Labor Law § 741.  Plaintiff alleges that: (1) Defendants[1] retaliated against her protected

speech in violation of the First Amendment and of Article 1, § 8 of the New York State

---

[1]Defendants are past and present employees of the New York State Office of Mental Retardation and
Developmental Disabilities (OMRDD) and OMRDD itself and past and present employees of the Willowbrook
Consumer Advisory Board (CAB) and CAB itself.

Constitution; and (2) Defendant OMRDD retaliated against Plaintiff for repeatedly reporting to her supervisors, the New York Civil Liberties Union (NYCLU), and OMRDD instances of improper quality of patient care, and for objecting to or refusing to participate in activities, policies, and/or practices that Plaintiff reasonably believed constituted improper quality of patient care, in violation of Labor Law § 741.

The OMRDD and the Defendants employed by that entity (Pezzolla, Colarusso, Broderick, and McGrath) have moved for summary judgment arguing that: (1) Plaintiff cannot substantiate a First Amendment retaliation claim under 42 U.S.C. § 1983; (2) Plaintiff cannot demonstrate that OMRDD Defendants intended to cause, or caused, a hostile work environment; (3) the doctrine of qualified immunity bars Plaintiff's claims for compensatory relief; (4) OMRDD Defendants were not personally involved in Plaintiff's dismissal; and (5) Plaintiff's relief as to OMRDD is barred by the Eleventh Amendment.  Plaintiff opposes the motion.

The CAB and the Defendants employed by that entity (Martin, Ferguson, Nehrbauer, and Turner) have also moved for summary judgment arguing that: (1) Plaintiff's claims are barred by the Eleventh Amendment; (2) Plaintiff's § 1983 claim is subject to dismissal because Plaintiff's speech was made in the course of her official duties; (3) Plaintiff cannot show that the letters at issue were a motivating factor in her termination; (4) the individual CAB Defendants were not personally involved in Plaintiff's termination; and (5) the individual CAB Defendants are entitled to qualified immunity.  Plaintiff opposes the motion.

I.      **FACTS**

Plaintiff was employed by CAB as a consumer advocate.  The CAB was established pursuant to the terms of the Willowbrook Injunction.  This Willowbrook Injunction was the end result of a class action lawsuit, <u>New York State Association for Retarded Children, et al. v. Mario Cuomo, et al.</u>, 393 F. Supp. 715 (E.D.N.Y. 1975), brought by the New York Civil Liberties Union (NYCLU) on behalf of disabled individuals at the Willowbrook State School in Staten Island, New York.  The CAB serves on behalf of the disabled individuals who had resided at the Willowbrook State School prior to 1972 and who did not have family members or other individuals willing or able to serve as their guardians and provide active representation for them.  The mandate of the CAB is to act *in loco parentis* and to provide all necessary and appropriate representation and advocacy services to all non-correspondent class members for as long as any such class member shall live.

Plaintiff was employed as a CAB Program Associate and was assigned responsibility for between 87 and 125 Willowbrook non-correspondent class members ("consumers") who resided in facilities in upstate New York.  Plaintiff's job duties and responsibilities included, but were not limited to, conducting visits to OMRDD facilities, attending meetings of the OMRDD team charged with her consumer's care, planning for her consumer's care, interacting with service providers to assure that appropriate care is given, and granting or withholding consent for her consumers' medical care.

Plaintiff alleges that in addition to managing her caseload she began reporting what she believed were systemic problems related to the treatment of all individuals served by the

Sunmount DDSO, an OMRDD operated facility.[2]  Plaintiff's complaint alleges that instead of conducting investigations of the systemic problems that exist for the patients in OMRDD run facilities, Defendants retaliated against her by engaging in investigations of her work performance, conducting a OMRDD and CAB joint investigation of her, and finally interrogating and terminating her in 2005.

Specifically at issue in this case are two letters dated February 20, 2004 and February 17, 2005.  They were both written on Plaintiff's personal letterhead during non-working hours.  The first of these letters was written to CAB Chairperson Nehrbauer and OMRDD Commissioner Maul.  This letter reported abusive and neglectful acts, systemic cover-up, and Medicaid fraud extending beyond the members of the Willowbrook class.  This letter resulted in a chain of correspondence with the Director of OMRDD Internal Affairs throughout the summer of 2004.  In these letters, Plaintiff alleges systemic abuse and cover up involving both her consumers and consumers not within her specific caseload.  The second letter, dated February 17, 2005, was also written to Chairperson Nehrbauer and OMRDD Commissioner Maul.  In this letter, Plaintiff reported that she was unsuccessful in initiating an investigation through Internal Affairs, and continued to assert that there existed abuse and neglect of consumers, this time including specific examples.

Defendants allege that Plaintiff was terminated in July 2005 as a result of unprofessional behavior causing Plaintiff to be an ineffective representative for her

---

[2]Plaintiff alleges that in 2002 she wrote memos to CAB Executive Director Martin and to the Director of Quality Assurance concerning problems with insufficient staffing levels, failure to engage individuals in appropriate programming, staff members allowing individuals to sleep in chairs rather than participate in program activities, and untrained staff members minimally supervising individuals and ignoring patients. Plaintiff alleges that she wrote a series of letters to the New York Civil Liberties Union, which had represented the plaintiffs in the Willowbrook class action lawsuit, concerning the failure to promptly diagnose cancer and to provide normal, post-operative cancer treatment for two of the consumers within her caseload.

consumers.  Specifically, over the years it was brought to CAB's attention that Plaintiff's style and temperament in performing her advocacy duties often led to unnecessary conflict with the treatment teams.  This led to various complaints regarding Plaintiff's behavior and raised concerns as to whether CAB consumers were being served effectively.[3]  Plaintiff also allegedly failed to follow proper protocol when attempting to advocate on behalf of consumers.

As a result of these issues, CAB received a fax from OMRDD requesting that CAB place Plaintiff on administrative leave.  CAB requested the documentation and information on the nature of these complaints, and subsequently received a variety of documentation critical of Plaintiff's behavior.  This included instances of Plaintiff authorizing unilateral changes to consumers' medical care without proper involvement or consultation with the treatment teams, and Plaintiff's refusal to allow team leaders to participate in meetings.  CAB took steps to remove the affected consumers from Plaintiff's caseload as it reviewed the situation.  On April 11, 2005, Turner and Plaintiff had a meeting which included the possibility of transitioning Plaintiff's caseload back to her.

On May 23, 2005, another complaint regarding Plaintiff's behavior was filed.  The complaint alleged that Plaintiff acted unprofessionally at a team meeting.  Plaintiff was placed on administrative leave pending an investigation.  Defendants contend that the ensuing investigation found support for the most recent allegations of unprofessional conduct, and

---

[3]The OMRDD Defendants allege that Plaintiff was the subject of many complaints from personnel at the OMRDD facilities.  The Public Employees Federation filed complaints which alleged Plaintiff displayed unreasonable, abusive, and unprofessional behavior in dealing with staff.  Another employee, Defendant McGrath, filed a complaint listing a number of instances of unprofessional and harassing behavior by Plaintiff.  These complaints were passed up the chain of command for evaluation and action, including possibly reassigning Plaintiff to other facilities.

further that it revealed a work environment marred by conflict and dysfunction.  Defendants

maintain that Plaintiff was then terminated as a result of her unprofessional behavior.


**II.        STANDARD OF REVIEW**

        Summary judgment, pursuant to Fed. R. Civ. P. 56(c), is warranted if "the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the

moving party is entitled to a judgment as a matter of law."  The party moving for summary

judgment bears the initial burden of showing, through the production of admissible evidence,

that no genuine issue of material fact exists.  Major League Baseball Properties, Inc. v.

Salvino, 542 F.3d 290, 309 (2d Cir. 2008).  Only after the moving party has met this burden is

the non-moving party required to produce evidence demonstrating that genuine issues of

material fact exist.  Salahuddin v. Goord, 467 F.3d 263, 272-73 (2d Cir. 2006).  The

nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's]

pleading" or "simply show that there is some metaphysical doubt as to the material facts."

Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585-86 (1986);

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); see also Fed. R. Civ .P. 56(e)

("When a motion for summary judgment is made [by a defendant] and supported as provided

in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading

....").  Rather, "[a] dispute regarding a material fact is *genuine* if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party."  Ross v. McGinnis, 00-CV-

0275, 2004 WL 1125177, at *8 (W.D.N.Y. Mar. 29, 2004) [internal quotations omitted]

[emphasis added].  It must be apparent that no rational finder of fact could find in favor of the

non-moving party for a Court to grant a motion for summary judgment.  Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223-24 (2d Cir. 1994); Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988).  In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997) [citation omitted]; Thompson v. Gjivoje, 896 F.2d 716, 720 (2d Cir. 1990) [citation omitted].

III.     DISCUSSION

   a.    Threshold Issue: The Eleventh Amendment

       The Defendants argue that Plaintiff's § 1983 claims against OMRDD and CAB, both of which are government agencies, are barred by the Eleventh Amendment.  The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI;  See Seminole Tribe of Florida, 517 U.S. 44, 54 (1996) (The Eleventh Amendment bars suits against a state by its own residents as well as by those of other states.); Schallop v. New York State Dept. of Law, 20 F. Supp.2d 384, 390 (N.D.N.Y. 1998) ("Claims brought against state agencies . . . constitute direct claims against the state and are barred by the Eleventh Amendment.") (citing Komlosi v. New York State Office of Mental Retardation & Developmental Disabilities, 64 F.3d 810, 815 (2d Cir. 1995)).  "Rather than an absolute bar to federal court jurisdiction, the Eleventh Amendment establishes a sovereign immunity from suit which may be waived by a state or abrogated by Congress." Schallop, 20 F. Supp.2d at 390.  It is well settled that Congress did not abrogate the

immunity provision in adopting § 1983, and there is no contention here that New York has waived its immunity by consenting to be sued in these circumstances.  Quern v. Jordan, 440 U.S. 332, 338 (1979).

Plaintiff concedes that the Eleventh Amendment entitles the OMRDD to governmental immunity, and therefore, the § 1983 cause of action brought against the OMRDD must be dismissed.  Plaintiff argues, however, that the CAB is not entitled to Eleventh Amendment immunity because, although a state agency, it was formed by the Federal Government and not the State of New York, and, therefore, there is no interference with state sovereignty.[4]  Furthermore, Plaintiff argues that the funding level for CAB was determined by the Federal Court and not the State of New York.

It is established that "a suit by private parties seeking to impose a liability which must be paid from public funds in the state treasury is barred by the Eleventh Amendment." Edelman v. Jordan, 415 U.S. 651, 663 (1974). The Supreme Court found that this includes retroactive payments wrongfully withheld.  Id. at 678.  Therefore, because any liability imposed upon CAB would come from the state treasury, the Eleventh Amendment bars any award of damages against CAB including front pay, back pay, and reimbursement for lost benefits.

In this case, Plaintiff also demands reinstatement.  "A plaintiff may sue a state official acting in his official capacity - notwithstanding the Eleventh Amendment - for prospective, injunctive relief from violations of federal law."  State Employees Bargaining Agent Coalition v. Rowland, 494 F.3d 71, 95 (2d Cir. 2007) (citing In re Deposit Ins. Agency,

---

[4]"The CAB was established by the Federal Court."  McLaughlin v. Pezzolla, 2007 U.S. Dist. LEXIS 13609 (N.D.N.Y. 2007).

482 F.3d 612, 617 (2d Cir. 2007) (internal quotation marks omitted)).  The Second Circuit has concluded that a state employee's constitutional challenge to his termination . . . was barred by the Eleventh Amendment to the extent he sought a retroactive award of back pay . . . [b]ut his equitable claim for reinstatement was not so barred." Dotson v. Griesa, 398 F.3d 156, 178 (2d Cir. 2005) (citing to Dwyer v. Regan, 777 F.2d 825, 836 (2d Cir. 1986).[5]

CAB Defendants argue that "[w]hile a party may seek injunctive relief to stop an ongoing violation of federal law, to obtain such relief, a plaintiff must still present evidence of a policy or practice that was the driving force behind the alleged constitutional wrong." See Docket No. 89.  They argue that "[a]t no point in the course of this litigation has Plaintiff produced any evidence of a policy or practice that served as the driving force behind the alleged wrongs in this case." Id.

For reasons to be discussed, the Court finds that Plaintiff has produced sufficient evidence to create a triable issue as to whether CAB terminated Plaintiff in retaliation for her constitutionally protected speech and, therefore, there is no Eleventh Amendment bar to that portion of Plaintiff's § 1983 cause of action against CAB seeking reinstatement.  Accordingly, Plaintiff's claims against the OMRDD and CAB seeking monetary damages must be

---

[5]Every circuit to have considered this issue has held that claims for reinstatement to previous employment are an exception to the Eleventh Amendment' sovereign immunity bar.  See State Employees Bargaining Agent Coalition v. Rowland, 494 F.3d 71 (2d Cir. 2007); Dotson v. Griesa, 398 F.3d 156, 178 (2d Cir. 2005); Dwyer v. Regan, 777 F.2d 825, 836 (2d Cir. 1985), modified, reh'g denied, 793 F.2d 457 (2d Cir. 1986); Whalen v. Mass. Trial Ct., 397 F.3d 19, 30 (1st Cir. 2005); Koslow v. Commonwealth of Pa., 302 F.3d 161, 179 (3d Cir. 2002); Coakley v. Welch, 877 F.2d 304, 307 n. 2 (4th Cir. 1989); Warnock v. Pecos County, 88 F.3d 341, 343 (5th Cir. 1996); Carten v. Kent State Univ., 282 F.3d 391, 396 (6th Cir. 2002); Elliott v. Hinds, 786 F.2d 298, 302 (7th Cir. 1986); Murphy v. State of Ark., 127 F.3d 750, 754 (8th Cir. 1997); Doe v. Lawrence Livermore Nat'l Lab., 131 F.3d 836, 840-42 (9th Cir. 1997); Meiners v. Univ. of Kan., 359 F.3d 1222, 1232-33 (10th Cir. 2004); Lassiter v. Ala. A & M Univ., 3 F.3d 1482, 1485 (11th Cir. 1993); Dronenburg v. Zech, 741 F.2d 1388, 1390 (D.C. Cir. 1984) (noting that claim by military officer against federal government seeking reinstatement was not barred by federal sovereign immunity).

dismissed.  The Eleventh Amendment does not bar Plaintiff's claim against CAB seeking reinstatement.

### b.    First Amendment Retaliation Claim

Plaintiff, a public employee, has asserted a First Amendment retaliation claim. Specifically, Plaintiff identified the two letters she wrote to Maul and Nehrbauer, in February 2004 and February 2005, as the speech at issue in her retaliation claim.  She maintains that Defendants retaliated against her for these communications culminating in her termination in July 2005.

A public employee who makes a First Amendment claim of employment retaliation pursuant to §1983 must show that: (1) the plaintiff engaged in protected speech; (2) she suffered an adverse employment decision, and (3) there is a causal connection between her speech and that adverse employment decision, so that it can be said that the plaintiff's speech was a motivating factor in the adverse employment action.  See Garcetti v. Ceballos, 547 U.S. 410, 418 (2006); Cioffi v. Averill Park Central School Dist. Board of Ed., 444 F.3d 158, 162 (2d Cir. 2006).  "If a plaintiff makes a sufficient showing of each of these elements, summary judgment is not appropriate unless the defendant establishes as a matter of law that he would have taken the same adverse employment action even absent the protected conduct."  Dillion v. Morano, 497 F.3d 247, 251 (2d Cir. 2007).  Specifically, the Second Circuit in Cioffi, 444 F.3d at 162-163, held that:

> [e]ven if the plaintiff establishes these three elements, his claim remains subject to several defenses.  First, the state may defend its actions by showing the employee's speech disrupted the workplace. Rankin v. McPherson, 483 U.S. 378, 388 (1987); see Connick v. Myers, 461 U.S. 138, 151-52 (1983). To prevail with this defense the public employer must demonstrate that its interest in promoting an efficient workplace outweighs the employee's interest in commenting on matters of public concern.  Connick, 461 U.S. at 140.  Also, the employer may avoid liability by

demonstrating that it would have taken the same adverse employment action "even in the absence of the protected conduct." <u>Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle</u>, 429 U.S. 274, 287 (1977).

### 1.   Whether Plaintiff's Speech was Protected

A public employee's speech may be constitutionally protected only if the plaintiff has spoken out as a citizen, not as an employee, on matters of public concern, rather than on matters of personal interest, and the state lacks an adequate justification for treating the employee differently from any other member of the general public. <u>See</u> <u>Garcetti</u>, 547 U.S. 410; <u>Pickering v. Board of Educ.</u>, 391 U.S. 563, 568 (1968); <u>Cotarelo v. Sleepy Hollow Police Dept.</u>, 460 F.3d 247, 252 (2d Cir. 2006); <u>Grillo v. New York City Transit Authority</u>, 291 F.3d 231, 235 (2d Cir. 2002); <u>Morris v. Lindau</u>, 196 F.3d 102, 110 (2d Cir. 1999).  "If the court determines that the plaintiff either did not speak as a citizen or did not speak on a matter of public concern, "the employee has no First Amendment cause of action based on his or her employer's reaction to the speech" and summary judgment is appropriate.  <u>Sousa v. Roque</u>, 578 F.3d 164, 170 (2d Cir. 2009) (citing <u>Garcetti</u>, 547 U.S. at 418).

### a.  Plaintiff Must Speak as a Citizen not as a Government Employee

In <u>Garcetti v. Ceballos</u>, 547 U.S. 410, 426 (2006), the Supreme Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not

insulate their communications from employer discipline."[6]  The parties dispute whether Plaintiff's speech was part of her official duties as a CAB consumer advocate.

The Garcetti Court did not articulate a comprehensive framework for determining whether an employee's speech is pursuant to her official duties as opposed to as a citizen because the "parties in [that] case [did] not dispute that Cebellos wrote his disposition memo pursuant to his employment duties."  Garcetti, 547 U.S. at 424.  Since Garcetti, courts have found the test to be a practical one and have articulated a number of factors, none of which are dispositive, to consider in determining whether the employee spoke pursuant to official duties.  These factors include "the plaintiff's job description; the person or persons to whom the plaintiff's speech was directed; and whether the speech resulted from special knowledge gained through the plaintiff's employment".  Caraccilo v. Village of Seneca Falls, N.Y., 582 F. Supp.2d 390, 405 (W.D.N.Y. 2008).  In Rankin, 483 U.S. 378, the Supreme Court found that to determine whether speech was made as an employee or as a private citizen entails an examination of the "content, form, and context of [the] statements, as revealed by the whole record."  Courts have clarified, however, that this determination can not be made solely on the basis of written job descriptions because public employers would be able to restrict employees' rights by creating excessively broad job descriptions.  Dorcely v. Wyandanch

---

[6]In Garcetti, 547 U.S. at 426, the Supreme Court reasoned that, "restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen.  It simply reflects the exercise of employer control over what the employer itself has commissioned or created. . . When he went to work and performed the tasks he was paid to perform, [plaintiff] acted as a government employee.  The fact that his duties sometimes required him to speak or write does not mean his supervisors were prohibited from evaluating his performance." In Garcetti, the plaintiff, Cebellos, a deputy district attorney serving as a calendar deputy, was contacted by a defense attorney, informed of inaccuracies in an affidavit used to obtain a critical search warrant, and asked to review the case.  This was not an unusual request of a calendar deputy.  Upon investigation, Cebellos concluded there were serious misrepresentations in the affidavit and relayed his findings to his supervisors.  Cebellos followed up by preparing a disposition memorandum.  The Supreme Court held that these communications and the memorandum were written pursuant to his official duties as a prosecutor and, therefore, were not protected by the First Amendment.

Union Free School Dist., 2009 WL 3232866 at *23 (E.D.N.Y. Sept. 30, 2009).  Finally, in

Hoover v. County of Broome, 2008 WL 1777444 at *4 (N.D.N.Y. April 16, 2008), this Court

stated that:

> [d]etermining whether speech is made in the course of one's employment or as a
> citizen is a fact intensive inquiry. Garcetti, 126 S. Ct at 1961.  "[A]d hoc or de facto
> duties fall within the scope of an employee's official responsibilities." Weisbath v.
> Geauga Park Dist., 499 F.3d 538, 544 (6th Cir. 2007).  Similarly, that fact that the
> speech may have been outside of their workplace or that the speech concerned the
> employee's employment is not dispositive.

In this case, Plaintiff's letters, dated February 20, 2004 and February 15, 2004, are

the speech at issue.  The Defendants argue that Plaintiff's speech is not entitled to First

Amendment Protection because her "letters [were] merely extensions of the same type of

complaints Plaintiff not only did make, but was expected to make, as a CAB representative"

and, therefore, were made in the course of her official duties.  See Docket No. 89.  Plaintiff

argues that the holding in Garcetti does not bar Plaintiff's claims because the facts of the

instant case are distinguishable from Garcetti.  Plaintiff argues that, unlike her letters,

Cebellos' statements were made solely in his capacity as a government employee, rendering

his statements pursuant to his official duties.  Plaintiff argues that her letters were not

pursuant to her official duties because she wrote them on personal letterhead, during non-

working hours and made complaints outside of her chain of command and outside of her job

description.

Plaintiff's first letter was written "to report specific cases of neglect and abuse

resulting in illness, injury, and/or death of people with developmental disabilities in the care or

OMRDD."  In this letter Plaintiff states that she is reporting "situations about which [she]

repeatedly expressed concern" and of which she had "made many written and verbal reports

. . . to DDSO and CAB Administrators."  It is undisputed that these prior reports and complaints were written pursuant to official duties as a CAB consumer advocate.  It is also undisputed that Plaintiff gained the knowledge complained of in her letters from her job as a CAB consumer advocate.

In a letter to Daniel Reardon, Director of Internal Affairs for OMRDD, Plaintiff later discussed this letter, stating "I had a *duty to report* the vast number of incidents uncovered in the course of performing my duties . . . I would share information equally with the CAB Board and OMRDD as I have an equal obligation to both agencies."  (emphasis added).  Plaintiff's own words evidence that she wrote this letter because of her subjective belief that she had a duty and obligation to the agencies which employed her.  These letters were consistent with her job acting as an advocate.

Defendants argue that Plaintiff was employed by the CAB to act *in loco parentis* on behalf of the various Willowbrook consumers to whom she was assigned and to be their advocate.  Her job was "to make decisions related to their care and to seek corrections if appropriate care was not given."  They argue that therefore Plaintiff was acting pursuant to her official duties when she wrote letters complaining about the conditions of the housing of her patients.

Plaintiff alleges that the letters exceeded her official duties because they were addressed to Maul and Nehrbauer, neither of whom were her direct supervisors.  It is undisputed that Plaintiff went outside of her chain of command in sending letters to Defendants Nehrbauer and Maul.

> Q: When you got communications directly from Susan Shirley, did you see that as
>    evidence that Susan Shirley was uncooperative?

- 14 -

A: I seldom got any communications from any staff person really directly. That's not the protocol of the operation of the CAB. Staff communicate with the executive director and their supervisors.

Docket No. 95 Exhibit 27 (Nehrbauer Depo.).

Q: What were the concerns?

A: Concerns that Susan in her position basically should not be addressing anything directly to me but to the board possibly, unless it said CAB Board, Ann Nehrbauer, Chairperson, something like that. That things have to be done according to the pattern that we set down to be done.

Docket No. 95 Exhibit 28 (Nehrbauer Depo.).

Q: Could you have contacted either or both as an employee of the CAB?

A: I don't believe so.

Q: Why don't you believe you have you contacted them?

A: Because that would have been outside of the chain of command. Thomas Maul wasn't in my chain of command and to contact Ann Nehrbauer as an employee I would have had to skip over two levels in my chain of command, so no.

Docket No. 95 Exhibit 24 (McLaughlin Depo.).

In this case, Plaintiff not only failed to act at the behest of her supervisors but acted against normal protocol for a CAB consumer advocate.  Because Plaintiff acted against protocol, the chairperson of the CAB expressed concern about Plaintiff's ability to act as an effective advocate.  This concern is relevant to the determination that this was not part of her official duties. See MA Affidavit 168  ("I would imagine we would have to do something about Susan because there is too much time being spent on other issues than our people.").

Plaintiff also argues that at least some of her complaints were outside of her job description because the letters reported problems associated with patients outside of her

caseload and relating to Medicaid fraud.  It is undisputed that Plaintiff's complaint that OMRDD was engaged in Medicaid fraud was outside the scope of Plaintiff's job description.

"Facts that can be "found" by "application of ... ordinary principles of logic and common experience . . . are ordinarily entrusted to the finder of fact."  Bose Corp. v. Consumers Union of United States, Inc., 466 U.S. 485, 501 n. 17 (1984).  "As the present case demonstrates, the scope and content of a plaintiff's job responsibilities can and should be found by a trier of fact through application of these principles."  Posey v. Lake Pend Oreille School District No. 84, 546 F.3d 1121, 1129 (9th Cir. 2008).  "Because the task of determining the scope of a plaintiff's job responsibilities is concrete and practical rather than abstract and formal, we are confident that a factual determination of a plaintiff's job responsibilities will not encroach upon the court's prerogative to interpret and apply the relevant legal rules."  Id.

Because Plaintiff's letters were written to individuals outside of Plaintiff's regular chain or command and parts of the letters concerned subjects outside of Plaintiff's job description there are material questions of fact concerning whether Plaintiff's letters were written pursuant to her official duties.  See Caraccilo, 582 F. Supp.2d at 411 ("although the ultimate issue of whether plaintiff engaged in that speech as a citizen or as a public employee is for the Court to decide as a matter of law, [it] found that the record . . . [was] insufficiently clear with respect to the content of, and the circumstances surrounding the speech to permit the Court to determine that issue at this time."); Skehan v. Village of Mamoroneck, 465 F.3d 96, 106 (2d Cir. 2006) (expressing no view on whether plaintiff's statements were made pursuant to his official duties as a police officer, since no factual record had been developed on that issue) (overruled on other grounds by Appel v. Spiridon,

531 F.3d 138 (2d Cir. 2008)); Caruso, 478 F. Supp.2d at 384 (stating that presence of factual

issues precluded court from determining whether employee spoke out pursuant to his official

duties, and that "[s]uch conclusions must await the trial of this matter"); Barclay v. Michalsky,

451 F. Supp.2d 386, 395-96 (D. Conn. 2006) (material issues of fact existed as to whether

plaintiff's complaints were made in the context of her job responsibilities).

### b. Plaintiff's Speech Must Address a Matter of Public Concern

Plaintiff asserts that her letters, dated February 20, 2004 and February 15, 2004,

are protected speech because their content "went beyond her own personal employment

grievances, to embrace important health and safety issues for all persons under the care of

OMRDD" reporting "specific cases of neglect and abuse resulting in illness, injury, and/or

death of people with developmental disabilities." See Docket No. 95 (Pl. Mem. Opp.

Summary Judg. at 13-14.) She felt the individual cases she was reporting were not limited to

their own unique circumstances but represented "systemic problems that exist for the

Willowbrook Class (as well as non-class)." Id.; see also MA Exhibits 22, 68.

"The question whether speech addresses a matter of public concern and thereby

enjoys protection under the First Amendment is one of law." Cioffi III v. Averill Park Central

School District Board of Ed., 444 F.3d 158, 163 (2d Cir. 2006); see Connick, 461 U.S. 138,

148 n. 7, 150 n.10. The Supreme Court has defined "a matter of public concern as one that

relates to any matter of political, social, or other concern to the community." Id. at 146. To

make the determination of whether the speech addresses a matter of public concern we

examine the "content, form, and context of a given statement, as revealed by the whole

record." See  id. at 147-148; Sousa v. Roque, 578 F.3d 164, 175 (2d Cir. 2009); Cioffi, 444

F.3d at 163. The Court should focus on the motive of the speaker, attempting to discern

whether the speech was calculated to redress personal grievances or whether it had a broader public purpose.  <u>Lewis v. Cohen</u>, 165 F.3d 154, 163-164 (2d Cir. 1999).  The key inquiry is whether the comment was made by plaintiff in her role as a disgruntled employee or in her role as a private citizen.  <u>Connick</u>, 461 U.S. at 146.

### (1)  Form

Defendants first argue that the letters do not address a matter of public concern because they were labeled "Confidential".  <u>See</u> Docket No. 89.  They argue that because Plaintiff "never spoke out . . ., any rationale for protecting Plaintiff's . . . speech evaporates." <u>See</u> Docket No. 89.  This argument has been addressed and rejected.  The Supreme Court has found that private speech can still address a matter of public concern.  <u>See</u> <u>Rankin</u>, 483 U.S. at 386 n. 11 ("The private nature of the statement does not . . . vitiate the status of the statement as addressing a matter of public concern."); <u>see</u> <u>also</u> <u>Cioffi</u>, 444 F.3d at 164 ("although [plaintiff] sent the November 7 letter privately to [defendants] it is not thereby deprived of First Amendment protection."); <u>Rookard v. Health & Hosps. Corp.</u>, 710 F.2d 41, 46 (2d Cir. 1983) ("That [plaintiff's] speech was made privately, rather than publicly, did not remove it from First Amendment protection.").

### (2) Content and Context

The letters at issue discuss: (1) neglect and abuse resulting in illness, injury, and/or death of people with developmental disabilities in the care of OMRDD, a New York State agency; (2)  the lack of training and supervision of Plaintiff, a person employed for their care; and (3) the lack of an agency response to reported complaints of these problems in the past. These incidents, the inadequacy of training and care within the facility, and the lack of a response to reported conditions implicate the health, welfare and safety of severely disabled

individuals in the care of the state, are matters of importance to the public.  See Dimarci v. Rome Hosp., 1991 WL 336000 at *1 (N.D.N.Y. July 1, 1991) (Court found complaints in which plaintiff "raised questions about . . . the professional conduct and medical judgment of several of his colleagues and the nursing staff, the Hospital's overall patterns and practices, and the leadership and competence of those individuals who were responsible for managing the Hospital" to be matters of public concern); Cioffi, 444 F.3d at 164 ("the incident itself, the deficiencies in adult supervision that allowed it to occur, and the possible insufficiencies of the school's response implicate the health, welfare and safety of young students, all of which are matters of importance to the public."); compare Coward v. Gilroy, 2007 WL 1220578 at *6 (N.D.N.Y. April 24, 2007) (finding speech not a matter of public concern because "statements made were specific and personal in nature" and related only to the treatment on one patient and contrasting that to the situation in DeMarco which was "wide-reaching and dealt with his patients' well being, the general workings of the hospital, and the community's interest in quality care.").

In the letter dated February 20, 2004 Plaintiff writes:

I am writing to report specific cases of neglect and abuse resulting in illness, injury, and/or death of people with developmental disabilities in the care of OMRDD.  Most but not all of these circumstances involve members of the Willowbrook Class. The situations about which I have repeatedly expressed concern involve abusive or neglectful acts and systemic cover-up . . . no one in authority has communicated with me to follow up on the reports I have made.

In the letter dated February 15, 2005 Plaintiff writes:

At this time last year I wrote to you in an attempt to report specific cases of neglect and abuse . . . As you know, I was unsuccessful initiating an investigation through your Internal Affairs Unit . . . the situations I have attempted to report continue to become more prevalent . . . I will share with you the extent of the systemic problems that exist for the Willowbrook Class (as well as non-class).

Clearly, the content of these letters report problems of a public concern because they implicate the well being of developmentally disabled patients within the state's care and systemic problems with the way the OMRDD runs its facilities. see Coward, 2007 WL 1220578, at *6 (finding that formal complaints or complaints concerning systemic concerns would have brought speech into the realm of public concern).

Defendants next argue that the contents of the letters do not address a matter of public concern because they "relate to Plaintiff's personal and job-related concerns, not some greater public concern."  See Docket No. 89; see Lewis, 165 F.3d at 163-64 ("the court should focus on the motive of the speaker and attempt to determine whether the speech was calculated to redress personal grievances or whether it had a broader public purpose . . . speech on a purely private matter, such as an employee's dissatisfaction with the conditions of his employment, does not pertain to a matter of public concern").  Specifically, Defendants argue that the letters make express reference to actions by her supervisors and her continued employment.

The first letter complains that:

> [N]o one in authority has communicated with me to follow up on the reports I have made . . . in the fifteen years with CAB I have had minimal supervision; i.e. no technical support, vague direction, and no performance standards or evaluations. However, for the past six years I have received no supervision whatsoever. I understand that an Assistant Director was selected ten months ago, yet the status of my supervision has not improved.

The second letter addresses the investigations on her work performance and ends with a request for a private meeting to discuss her concerns and "whether or not it is appropriate for the Consumer Advisory Board to continue as [her] employer."

Defendants contend that Plaintiff's motive for writing the letters was to address personal matters at her job and were written specifically in response "to possible disciplinary action."  They argue that a "public employee may not transform a personal grievance into a matter of public concern by invoking a supposed popular interest in the way public institutions are run."  Rutolo v. City of New York, 514 F.3d 184, 190 (2d Cir. 2008).  Defendants allege that the "information base for the two letters was her admitted frustration with co-workers, investigations, complaints about her conduct and treatment of her clients over a period of years" and that the her **"**personal, subjective interests . . . do not qualify as matters of public concern."  See Docket No. 87;  Connick, 461 U.S. at 147-49.

"[D]efendant's contention that a speaker's primary motivation for speaking is dispositive in determining whether speech is personal or public conflicts directly with the Supreme Court's holding in Connick [which held that] although personal interest primarily motivated the speech . . . one of the questions on the questionnaire touched upon a matter of public concern and was thus protected by the First Amendment." Cioffi, 444 F.3d at 165; see Connick, 461 U.S. at 148.  Therefore, in this case, even if some of Plaintiff's motivation for writing the letters was for her personal benefit, "having a personal stake or motive in speaking does not, on its own vitiate the status of the speech as one of public concern." Cioffi, 444 F.3d at 166; see Johnson v. Ganim, 342 F.3d 105, 114 (2d Cir. 2003); Munafo, 285 F.3d at 211-12 (rejecting contention that plaintiff's speech not of public concern because plaintiff motivated by personal interest).  Furthermore, Plaintiff's letters themselves indicate a motivation of reporting cases of abuse and neglect.  Even if Plaintiff was speaking partly to save her job, "personal interests frequently induce speech that is nonetheless of public concern." Cioffi, 444 F.3d at 166; see Johnson, 342 F.3d at 114 ("[T]he mere fact that

[plaintiff] took a personal interest in the subject matter of the speech does not remove the letter from the protection of the First Amendment.").

Finally, the context of the complaints leads to the conclusion that the health and safety of many of the affected patients are a matter of public interest.  The patients who are the subject of these letters are not just supported and cared for by the state, they were also the subject of a class action lawsuit brought to remedy previous abuses.  This lawsuit resulted in an injunction and the creation of CAB to monitor their care.  The filing of a lawsuit, the existence of an injunction, and the creation of CAB are evidence that the well being of these individuals are a matter of public and social concern.  See Cioffi, 444 F.3d at 164.  For the foregoing reasons, the Court finds that the contents of Plaintiff's letters address matters of public concern and are therefore protected by the First Amendment.

### 2.  Speech must be a Substantial or Motivating Factor in Plaintiff's Termination

It is undisputed that Plaintiff suffered an adverse employment decision when she was terminated as a CAB employee.  To succeed upon her First Amendment claim under § 1983, Plaintiff must present evidence that her protected speech was a substantial or motivating factor in this termination.  Raniola v. Bratton, 243 F.3d 610, 625 (2d Cir. 2001).

### a.  Individual Defendants must be aware of the Protected Speech

Plaintiff must first show that each individual Defendant was aware of her allegedly protected speech at the time of her termination.  Pavone v. Puglisi, 2009 WL 3863362, at *2 (2d Cir. November 19, 2009) ("Although a causal connection between an adverse action and protected speech may be indirectly established by showing that protected activity was

followed closely in time by the adverse action . . . a plaintiff must still allege that defendants were aware of the protected activity.").

The Individual CAB Defendants, except for Victor Turner, admit that they were aware of the contents of Plaintiff's allegedly protected speech.  The OMRDD Defendants, however, argue that they were unaware of the letters or their contents at the time of Plaintiff's termination.  Without allegations regarding the individual Defendants' knowledge of the protected speech, Plaintiff has not sufficiently plead a claim of retaliation and summary judgment will be granted as to those Defendants.

### (1)   Victor Turner

Turner admits that he was aware of the letters containing Plaintiff's allegedly protected speech but disputes that he was aware of the letter's contents.  A jury could infer that Turner was aware of the contents of the letters because he was aware of their existence.  Therefore, summary judgment as to Plaintiff's First Amendment retaliation claim against Turner is denied.

### (2)   Peter F. Pezzolla

There is no evidence that Pezzolla had knowledge of the letters to Nehrbauer or Maul which contain the allegedly protected speech.  Pezzolla states, in his sworn affidavit, that: (1) "[p]rior to being shown these letters for the preparation of this Declaration, I had never seen them and had no knowledge of their existence;" and (2) "[p]rior to the preparation of this declaration, no one had ever discussed the letters or their content with me."  Plaintiff denies these facts and points to evidence that Pezzolla was involved in conversations discussing her many complaints during her employment.  She points to no evidence, however, that Pezzolla knew of these letters or any protected speech.  "Such conclusory

allegations without supporting facts, such [as Defendant was aware of the existence of the letters,] will not support a First Amendment retaliation claim."  Rosendale v. Brusie, 2009 WL 778418, at *9 (S.D.N.Y. March 25, 2009); see Brown v. Nelson,, No. 05-CV-4498, 2008 U.S. Dist. LEXIS 101118, at *11 (S.D.N.Y. Jan. 25, 2008) ("Plaintiff may not rely on conclusory allegations suggesting causation."); Geiger v. Town of Greece, No. 07-CV-6066, 2007 U.S. Dist. LEXIS 87466, 2007 WL 4232717, at *26 (W.D.N.Y. Sept. 4, 2007) (causation not adequately pled by "purely conclusory" allegations).  As there is no evidence that Pezzolla had knowledge of the allegedly protected communication Plaintiff has not sufficiently plead a claim of First Amendment retaliation as to Pezzolla and Plaintiff's First Amendment claim against Pezzolla must be dismissed.

### (3)   Joseph J. Colarusso

Like Pezzolla, there is no evidence that Colarusso had knowledge of the letters to Nehrbauer or Maul which contain the allegedly protected speech.  Colarusso states, in his sworn affidavit, that: (1) "[p]rior to being shown these letters for the preparation of this Declaration, I had never seen them and had no knowledge of their existence;" and (2) "[p]rior to the preparation of this Declaration, no one had ever discussed the letters or their content with me."  Plaintiff denies these facts and points to evidence that Colarusso may have known she was retaliated against for her unprotected complaints.[7]  Plaintiff points to no evidence that Colarusso knew of the letters that Plaintiff alleges contain protected speech.  As there is no evidence that Colarusso had knowledge of the allegedly protected communication Plaintiff

---

[7]In addition to Plaintiff's letters, Plaintiff filed many additional complaints. It is undisputed that these complaints were filed pursuant to her job as a CAB advocate and were therefore unprotected by the First Amendment.

has not sufficiently plead a claim or retaliation as to Colarusso and her First Amendment claim against Colarusso must be dismissed.

### (4)   Kathleen Broderick

Broderick admits in her sworn affidavit that: (1) "[p]rior to being shown [Plaintiff's] letters for the preparation of this Declaration, I had never seen them;" (2) "[o]n or about February 24, 2004, I was told that an investigation was being conducted based upon a complaint from Plaintiff;" (3) "I later heard about the February 17, 2005 letter, in conversation sometime after it was received by OMRDD but did not have any details;" and (4) "Other than what is recited above, no one ever discussed the letters or their content with me."  Because, Broderick knew of the existence of the letters, a reasonable jury could conclude that she also knew the contents of the letters.  Because issues of fact for the trier of fact remain, summary judgment as to Plaintiff's First Amendment claim against Broderick must be denied.

### (5)   Laura McGrath

Laura McGrath, prior to preparation for litigation, had no knowledge of the letters written to Nehrbauer or Maul.  She had never seen the letters nor discussed them with anyone.  Plaintiff concedes that her First Amendment claim against McGrath must be dismissed.

Therefore, Plaintiff's claims against McGrath, Pezzolla, and Colarusso must be dismissed for a lack of knowledge of the protected speech.  Conversely, there are facts sufficient to support an inference that Turner and Broderick were both aware of the protected speech.

b.   **Causation**

Plaintiff also must show a causal connection between the adverse employment action and the protected speech.  Causation may be "shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment . . . or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." Gordon v. New York City Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000); Perrotti v. Town of Middlebury, 2009 WL 3682535, at*7 (D.Conn. November 2, 2009) (citing McCullough v. Wyandanch Union Free School Dist., 187 F.3d 272, 280 (2d Cir. 1999)) ("Plaintiff can also establish retaliatory motive by demonstrating that defendants were aware that plaintiff had engaged in protected speech and the challenged behavior closely followed that protected speech.").

In this case, Plaintiff sent her second letter to Nehrbauer and Maul on February 15, 2005.  She was terminated on July 22, 2005.  Only five months had elapsed between Plaintiff's speech at issue and her termination.  No "bright line . . . define[s] the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." Id. ("On the facts of this case, the lapse of only several months after the letter and several weeks after the press conference between the protected speech and adverse employment action is sufficient to support an allegation of a causal connection strong enough to survive summary judgment.").

Additionally, Plaintiff points to statements made by Nehrbauer regarding the letters at issue that can support a finding of retaliatory animus. See Docket No.95 ("When defendant Nehrbauer received the letters directed to herself and to the OMRDD

Commissioner Maul, she felt 'we certainly better give it, the board, very serious attention as to her future with CAB.'" [MA ¶ 169]); ("After they received the letter dated February 17, 2005, they determined that 'something has to be done'".[MA ¶ 166]).  Therefore, Plaintiff has presented sufficient evidence to raise a triable issue on causation.

### c.    Personal Involvement

In order to establish individual liability under § 1983, a plaintiff must show: (1) that the defendant is a "person" acting "under the color of state law;" and (2) that the defendant caused the plaintiff to be deprived of a federal right.  Kentucky v. Graham, 473 U.S. 159, 166 (1985).  Additionally, Second Circuit precedent requires "personal involvement of defendants in alleged constitutional deprivations" as a prerequisite to any award of damages under § 1983.  Clark v. Levesque, 2009 WL 1941191, at *1 (2d Cir. July 8, 2009) (quoting Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995)); see also Wallace v. Conroy, 945 F. Supp. 628, 638 (S.D.N.Y. 1996) ("A complaint "that fails to allege personal involvement of the defendant is fatally flawed.") (citing Alfaro Motors, Inc. v. Ward, 814 F.2d 883, 886 (2d Cir. 1987)).  Therefore, "[t]he doctrines of respondeat superior and vicarious liability are . . . inapplicable in Section 1983 actions."  Clark, 2009 WL 1941191, at *1 (citing Collins v. City of Harker Heights, 503 U.S. 115, 121 (1992)).  Accordingly, a plaintiff must show some tangible connection between the constitutional violation alleged and a particular defendant.  "[T]his principle applies to causes of action claiming unlawful retaliation."  Amaker v. Kelley, 2009 WL 385431, at *17 (N.D.N.Y. February 9, 2009); see Gronowski v. Spencer, 424 F.3d 285, 293 (2d Cir. 2005) ("sufficient evidence existed for the jury to reasonably find that the Mayor was involved in the action adversely affected Gronowski and that this involvement was precipitated by the Mayor's dislike for Gronowski's political activities.")

"Direct participation as a basis of liability in this context requires intentional participation in the conduct constituting a violation of the victim's rights by one who *knew* of the facts rendering it illegal." Gronowski, 424 F.3d at 293 (citing Provost v. City of Newburgh, 262 F.3d 146, 155 (2d Cir. 2001)) (emphasis added). "In a retaliation case, an employer's state of mind is necessarily at issue." Gronowski, 424 F.3d at 293. "In making this determination, the jury is permitted, of course, to rely on circumstantial evidence to support the required inference of retaliatory intent. Id. (citing Morris v. Lindau, 196 F.3d 102, 110 (2d Cir. 1999).

Personal involvement can be demonstrated in a number of ways. "[I]f the defendant is alleged to have acted as plaintiff's supervisor, his personal involvement may be shown through his failure to correct the illegal behavior after learning of the violations, his creation of a custom or policy under which the violations either occurred or were allowed to continue, or lastly, if he was grossly negligent in overseeing the employees who were responsible for the violation of plaintiff's rights." Jamison v. Chapman, 2009 WL 3762348 at *10 (N.D.N.Y. November 9, 2009) (citing to Moffitt v. Town of Brookfield, 950 F.2d 880, 886 (2d Cir. 1991)). "Even if the defendant is not a supervisory official, he may nonetheless be personally involved in the violation of plaintiff's civil rights if he directly participated in the unlawful conduct." Id.

Given the number of defendants, separate consideration of each is necessary. It also follows that Plaintiff may establish personal involvement as to some of the Defendants, but not necessarily all of them. There must be evidence that Defendants were personally involved in Plaintiff's termination and that each acted in retaliation against Plaintiff's letters to Maul and Nehrbauer.

*1.   Kathleen Broderick*

It is undisputed that Broderick is a person acting under the color of state law as she is a state employee.  Broderick admits that she played a role in Plaintiff's termination by recommending that Plaintiff "be placed on paid administrative leave in order to investigate formal complaints alleging neglect and jeopardy to the health and safety of the consumers." There is also evidence that Broderick took action to put Plaintiff on administrative leave. Furthermore, as stated previously, because Broderick knew of the existence of the letters, a reasonable jury could conclude that she also knew the contents of the letters at the time she took this action.  A reasonable jury could find that Broderick was personally involved in the violation of Plaintiff's First Amendment rights and summary judgment must be denied.

**2.**   *Rita M. Martin*

Rita Martin was no longer an employee of the CAB at the time of Plaintiff's termination.  Martin stayed on, however, after Ferguson was hired to replace Plaintiff in order to help with the transition.  Martin's last day of work was December 19, 2004.  Martin admits that she saw the February 20, 2004 letter to Nehrbauer and Maul and that she discussed it with OMRDD Director of Internal Affairs, Daniel Reardon.  Martin also admits that she was aware of the complaints about Plaintiff's behavior and that she heard a rumor that Plaintiff was to be terminated.  Martin claims she was not a party to the decision to terminate Plaintiff and that she does not know why Plaintiff was terminated.

As it is undisputed that Martin was aware of the contents of the protected speech, liability can be found only if she were: (1) acting under color of state law; and (2) personally involved in the decision to terminate Plaintiff.

It is undisputed that Martin was no longer working for CAB at the time of Plaintiff's termination.  "A private actor acts under color of state law [for purposes of section 1983] when the private actor 'is a willful participant in joint activity with the State or its agents.'" Ciambriello v. County of Nassau, 292 F.3d 307, 324 (2d Cir. 2002) (quoting Adickes v. S.H. Kress and Co., 398 U.S. 144, 152 (1970)). "A merely conclusory allegation that a private entity acted in concert with a state actor does not suffice to state a § 1983 claim against the private entity."  Id.  There must be some factual allegation suggesting that Martin conspired with CAB.  See Ciambriello v. County of Nassau, 292 F.3d 307, 324 (2d Cir. 2002) (Absent from [Plaintiff's] complaint are any factual allegations suggesting that CSEA conspired with the County); compare Hughes v. Patrolmen's Benevolent Ass'n of the City of N.Y., Inc., 850 F.2d 876, 880-81 (2d Cir. 1988) (holding that complaint alleged sufficient facts to support conclusion that private-actor PBA had acted under color of state law, where complaint alleged, inter alia, that PBA had hired private investigators and placed plaintiff under surveillance with knowledge and consent of state-actor New York City Police Department).

In this case, Plaintiff alleges that she was told by Turner that "Ferguson went to Martin's house in New Jersey after Martin retired to discuss [her] termination" and contends that Martin could not have been completely removed at the time of Plaintiff's termination because she admitted that she had heard rumors that Plaintiff would be terminated.  Plaintiff admits, however, that she does not know the "precise role Martin played in her termination." Because there are no factual allegations that Martin continued to work with CAB or that CAB cloaked her with any authority, Martin was not acting under the color of state law and could not be personally involved in a violation of Plaintiff's First Amendment rights.  Summary judgment is granted as to Plaintiff's § 1983 claim against Martin.

### 3.    Ann T. Nehrbauer

Ann Nehrbauer admits her personal involvement in the decision to terminate Plaintiff.  She talked "ad nauseam" with Ferguson about the decision to implement the termination process.  Furthermore, it is undisputed that as a state employee any actions taken by Nehrbauer are under color of state law.  The letters at issue were addressed to Nehrbauer and Nehrbauer responded to them.  Therefore, Nehrbauer was aware of the protected speech and participated in Plaintiff's termination.  Summary judgment as to Plaintiff's § 1983 claim against Nehrbauer is denied.

### 4.    Victor M. Turner

Turner was Plaintiff's immediate supervisor at the time of her termination.  He alleges he was not involved in her termination.  Plaintiff alleges that Turner was directly involved because he was aware she was being retaliated against for her speech and he participated with no objection in the events leading up to her termination, including the decision to remove her caseload.  Because Turner participated in the removal of Plaintiff's caseload prior to her termination, summary judgment as to Plaintiff's § 1983 claim against Turner is denied.

### 5.    Antonia J. Ferguson

Antonia Ferguson admits her personal involvement in the decision to terminate Plaintiff.  She admits that she made a recommendation to the Board that Plaintiff be terminated and that she wrote the actual letter terminating Plaintiff.  Furthermore, it is undisputed that as a state employee any actions taken by Ferguson are under color of state law.  Therefore, summary judgment as to Plaintiff's § 1983 claim against Ferguson is denied.

###### d.      Qualified Immunity

Under the doctrine of qualified immunity, "government officials performing discretionary functions are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Kelsey v. County of Schoharie, 567 F.3d 54, 60 (2d Cir. 2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  "The appropriate inquiry is an objective one: whether a reasonable official could have believed that his actions were lawful in light of clearly established law and the information he possessed."  Pavone v. Puglisi, 2009 WL 3863362 at *1 (2d Cir. November 19, 2009) (citing to Kelsey, 567 F.3d at 61).  "When specific intent is an element of the plaintiff's claim, it is never objectively reasonable for a government official to act with the prohibited intent."  Pavone, 2009 WL 3863362 at *1 (citing to Reuland v. Hynes, 460 F.3d 409, 419 (2d Cir. 2006)).  "Qualified immunity is also said to protect the government officer 'if it was "objectively reasonable" for him to believe that his actions were lawful at the time of the challenged act.'"  Kelsey, 567 F.3d at 61 (quoting Lennon v. Miller, 66 F.3d 416, 420 (2d Cir. 1995).

At the time of Plaintiff's termination, it was well established that an employee could not be terminated in retaliation for First Amendment protected speech.  Furthermore, the caveat limiting the scope of protected speech set out in Garcetti v. Ceballos, 547 U.S. 410, 426 (2006), was not yet established.[8]  Therefore, at the time of Plaintiff's termination, Defendants would have been aware that they were violating Plaintiff's First Amendment rights if they terminated her in retaliation for her speech.

---

[8]This case narrowed the definition of constitutionally protected speech holding that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens . . . and the Constitution does not insulate their communications from employee discipline.

As shown *supra*, Plaintiff provides sufficient evidence of a constitutional violation so as to survive summary judgment. Furthermore, there are material issues of fact as to the remaining Defendants' knowledge and intent which prevent this Court from ruling as a matter of law that these Defendants are entitled to qualified immunity.

## IV.      CONCLUSION

For the foregoing reasons, summary judgment as to Plaintiff's claims are GRANTED as to OMRDD, McGrath, Pezzolla, Martin, and Colarusso and DENIED as to CAB, Broderick, Ferguson, Nehrbauer, and Turner.

IT IS SO ORDERED.

Dated:December 17, 2009

Thomas J. McAvoy
Senior, U.S. District Judge